UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

ROBERT CLARK (#611786)            CIVIL ACTION

VERSUS

JAMES LEBLANC, ET AL.            NO.: 3:19-00512-BAJ-RLB

## RULING AND ORDER

Before the Court is Plaintiff's **Request for Emergency Temporary Restraining Order (Doc. 10)**. Plaintiff was born a male, but as Plaintiff's Request (Doc. 10) and other pleadings filed in this matter explain, Plaintiff has been diagnosed with a medical condition known today as "gender dysphoria." The State of Louisiana Department of Public Safety and Corrections recognizes "gender dysphoria disorder," and provides that a confirmed diagnosis shall result in an individualized treatment plan that will meet the acceptable standard of care. (Doc. 3-3 at p. 3–4). Treatment requests beyond those specified in the policy, such as Plaintiff's request to maintain long hair, are to be forwarded to a Gender Dysphoria Clinical Management Team (GDCMT) for review. Based on the record, the Court cannot determine whether Defendants complied with this policy.

The American Psychiatric Association ("APA") defines "gender dysphoria" as a marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months duration, as manifested by at least two of six factors: (1) a marked incongruence between one's experienced/expressed gender and primary

1

and/or secondary sex characteristics...(2) a strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender...(3) a strong desire for the primary and/or secondary sex characteristics of the other gender; (4) a strong desire to be of the other gender (or some alternative gender different from one's assigned gender); (5) a strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender); and (6) a strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender). *See Diagnostic and Statistical Manual of Mental Disorders* ("DSM-5"). The APA further notes that the condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.

A review of the records provided by Plaintiff reveals that, as early as June 8, 2016, Plaintiff was noted by Dr. Gamble to be complaining of stressors "largely in the context of gender dysphoria..." *See* (Doc. 3-4 at p. 41). That same month, Plaintiff requested to be placed on hormones and to be allowed to shower alone. Plaintiff's requests were forwarded to Dr. Lavespere, whose response was, "Hormones denied. Shower as per security." *See* (Doc. 3-4 at p. 42). Plaintiff again requested hormone therapy, and to be allowed to alter Plaintiff's appearance to appear more effeminate on June 28, 2016 and again on July 22, 2016. *See* (Doc. 3-4 at p. 43–44). On August 4, 2016, Plaintiff was informed by a social worker that there were no specific policies in place for those with gender dysphoria.

On October 18, 2016, Plaintiff's diagnosis of gender dysphoria was documented by Dr. Gamble, and Dr. Gamble again referred the plaintiff to Dr. Lavespere for treatment. *See* (Doc. 3-4 at p. 45–46). Dr. Lavespere responded that Plaintiff's case was being discussed with the "HQ office." (Doc. 3-4 at p. 47). In November, Dr. Gamble again consulted with Dr. Lavespere, who responded that a policy was being discussed at the "HQ office." (Doc. 3-4 at p. 52). Plaintiff continued to request treatment for gender dysphoria and no treatment other than counseling was provided. On January 26, 2017, Plaintiff was placed on suicide watch. (Doc. 3-4 at p. 56). On March 27, 2017, Plaintiff was again placed on suicide watch. (Doc. 3-4 at p. 65). On November 13, 2018, Plaintiff was again told that counseling through the psychiatry department would be the only treatment offered for Plaintiff's diagnosis. (Doc. 3-4 at p. 76). Plaintiff alleges that as a result of medical attention being denied, Plaintiff suffers from insomnia, clinical depression, and dysphoria, and has attempted auto castration resulting in stitches, and another suicide attempt resulting in staples being placed to close the wound. (Doc. 3-2 at p. 7).

As such, Plaintiff undeniably has experienced a marked incongruence between Plaintiff's experienced/expressed gender and assigned gender, of at least 6 months duration, as manifested by at least two of six factors listed in the DSM-5. Plaintiff also meets the definition for "gender dysphoria" as set forth in the Department of Public Safety and Corrections Health Care Policy No. 47 titled, "Identification and Management of Intersex Offenders, Transgender Offenders, and Offenders Diagnosed with Gender Dysphoria Disorder." (Doc. 3-3 at p. 4). Said policy also

3

provides that when an offender's diagnosis of gender dysphoria is confirmed, a GDCMT shall be formed to evaluate and manage the offender and formulate an individualized treatment plan which meets the acceptable standard of care. Per the policy, treatment may consist of mental health care, hormone therapy, housing and programming, and choice of showering preference. Other requests pertaining to gender dysphoria needs are to be forwarded to the GDCMT for review. *See* (Doc. 3-3).

In the instant Request (Doc. 10), Plaintiff alleges that Plaintiff's request to maintain a long hair length was denied by "headquarters" and was informed that Plaintiff could either get a haircut or would be held down while Plaintiff's hair was cut and receive a disciplinary infraction. Based on the record before the Court, the Court cannot ascertain whether Plaintiff's request to maintain long hair was reviewed by the GDCMT as required by Health Care Policy No. 47, or whether a GDCMT exists for Plaintiff at all.

To obtain injunctive relief, Plaintiff must establish: (1) a substantial likelihood of prevailing on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) the threatened injury outweighs any harm that will result to the non-movant if the injunction is granted; and (4) the injunction will not disserve the public interest. *See Ridgely v. Fed. Emergency Mgmt. Agency*, 512 F.3d 727, 734 (5th Cir. 2008).

Based upon the standards of care submitted by Plaintiff, it appears that Plaintiff is being denied necessary treatment for gender dysphoria that meets the

prevailing standards of care. (Doc. 3-5 at p. 12). As evidenced by Plaintiff's medical records, Plaintiff's risk of suicide and other self-harm pose a substantial threat of irreparable harm. Plaintiff has been offered no viable option to relieve the ongoing gender dysphoria. As such, Plaintiff has established a substantial threat of irreparable harm that outweighs any harm the non-movant would suffer from the injunction being granted (allowing Plaintiff to maintain long hair).

Plaintiff also has a substantial likelihood of prevailing on the merits. Based upon the record before the Court, Plaintiff's prescribed treatment of counseling has not relieved the ongoing gender dysphoria and Plaintiff has been offered no additional treatment indicating deliberate indifference to Plaintiff's medical needs. *See Gibson v. Collier*, 920 F. 3d 212 (5th Cir. 2019) (finding no deliberate indifference to the plaintiff's medical needs where the plaintiff was treated with means, accepted within the medical community, other than sex reassignment surgery, including counseling and hormone therapy).

Furthermore, there is no indication that allowing Plaintiff to maintain long hair will disserve the public interest. The Court does not contemplate that any monetary costs will be incurred at this time, and public interest weighs in favor of providing Plaintiff with treatment within the acceptable standards of care. As such, these factors weigh in favor of granting Plaintiff's Request.

Finally, Federal Rule of Civil Procedure 65(c) requires Plaintiff to provide security, but the rule gives the Court discretion in determining the sum. Plaintiff herein is indigent, and it appears that no costs of damages will be incurred during

the pendency of the temporary restraining order. As such, no security bond is required.

Accordingly,

**IT IS ORDERED** that Plaintiff's **Request for Emergency Temporary Restraining Order (Doc. 10)** is **GRANTED**, without notice due to the urgency of this matter and for lack of service at this time on any defendant named herein, to prevent Plaintiff from suffering irreparable harm in the form of suicide or self-harm.

**IT IS FURTHER ORDERED** that during the pendency of this Order, Plaintiff's hair shall not be cut unless so requested by Plaintiff.

**IT IS FURTHER ORDERED** that a hearing to determine whether to convert this temporary restraining order into a preliminary injunction is set for an evidentiary hearing on the 22nd day of October, 2019 at 2:00 p.m.

**IT IS FURTHER ORDERED** that a copy of this temporary restraining order shall be served upon Secretary James LeBlanc and Warden Darrel Vannoy, by the Clerk of this Court, via the most expeditious means of delivery available.

Baton Rouge, Louisiana, this 9th day of October, 2019.

_____
JUDGE BRIAN A. JACKSON
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA