# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

ROBERT CLARK (#611786)                                    CIVIL ACTION

VERSUS

JAMES LEBLANC, ET AL.                                NO. 19-00512-BAJ-SDJ

## RULING AND ORDER

Plaintiff is a transgender inmate, diagnosed with gender dysphoria (GD) in October 2016. She[1] is confined at the Louisiana State Penitentiary (LSP), where, since her diagnosis, she has received ongoing treatment to address her gender dysphoria, including medication, counseling, and other interventions. Since May 2020, Plaintiff has also received hormone therapy, with positive results. Still, Plaintiff is not fully satisfied with her standard of care. The issue that remains is whether, in addition to her current treatment regimen, the Eighth Amendment to the U.S. Constitution entitles Plaintiff to electrolysis and "effeminate commissary products," thereby better enabling Plaintiff to "express her female gender through grooming, clothing, and female pronoun use." (Doc. 7 at p. 26).[2]

LSP has denied these additional requests, and now the State seeks summary judgment, arguing that because Plaintiff has been continuously treated for GD since

---

[1] Consistent with Plaintiff's preference, the Court refers to Plaintiff using female pronouns. However, to avoid clerical errors, the Court transcribes Plaintiff's prison records as written, which almost invariably refer to Plaintiff using male pronouns.

[2] This is *not* a sex reassignment surgery case. (Doc. 87 at p. 7 ("Plaintiff does not currently seek sex reassignment surgery.")). At the time she filed suit, the U.S. Court of Appeals for the Fifth Circuit had already held that the Eighth Amendment's prohibition against cruel and unusual punishment does not compel the State to provide sex reassignment surgery to a transgender inmate. *Gibson v. Collier*, 920 F.3d 212 (5th Cir. 2019).

1

her diagnosis she cannot establish that her care team responded with deliberate indifference to her serious medical need, as required to prevail in an Eighth Amendment claim. (Doc. 86). Plaintiff opposes summary judgment. (Doc. 87).

For reasons below, the Court determines that Plaintiff's remaining demands fail to support an actionable claim under the Eighth Amendment, that the State is entitled to judgment in its favor, and that Plaintiff's action must be dismissed.

## I.  BACKGROUND

### A. Summary Judgment Evidence[3]

The following undisputed facts are material to the Court's analysis:

Plaintiff arrived at LSP in February 2014. She is serving a term of 75 years imprisonment after being convicted of armed robbery in the Twenty-Sixth Judicial District Court for the Parish of Bossier. (Doc. 29-2 at p. 14).

---

[3] As is often true in *pro se* prisoner cases, the two sides have cherry-picked the evidence submitted in support of their summary judgment positions, resulting in wildly divergent accounts of the material facts underlying this dispute. Heeding the adage that the truth typically lies between the extremes, the Court has conducted an independent review of the record. The facts set forth below are drawn primarily from Plaintiff's certified Institutional File (Docs. 29-1, 29-2) and certified Medical Records, (Docs. 29-3, 29-4, 80-1). Notably, each side relies heavily on *portions* of these documents, and their accuracy is undisputed.

Where necessary, and as appropriate, the Court supplements with facts drawn from the parties' summary judgment pleadings, including Plaintiff's *pro se* Answer To Defendants' Motion For Summary Judgment (Doc. 87, the "Verified Opposition"), which is sworn under penalty of perjury, and sets forth certain particularized facts that are based on Plaintiff's personal knowledge. These "facts"—while largely self-serving—are properly considered at this stage. *See Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 161 (5th Cir. 2021).

By contrast, the Court does *not* accept the allegations set forth in Plaintiff's operative Amended Complaint as competent summary judgment evidence. Plaintiff's declaration accompanying her Amended Complaint attests only to the accuracy of Plaintiff's "History of Previous Lawsuits," (Doc. 7 at p. 30), *not* Plaintiff's allegations forming the basis of her claims. *See King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (an unverified complaint "does not constitute competent summary judgment evidence").

Plaintiff was born biologically male, and now identifies as a "transgender woman with gender dysphoria." (Doc. 7 at p. 6). The American Psychiatric Association defines "gender dysphoria" as a "marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months duration, as manifested by" at least two of the following six factors:

> 1. A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics.... 2. A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender.... 3. A strong desire for the primary and/or secondary sex characteristics of the other gender. 4. A strong desire to be of the other gender (or some alternative gender different from one's assigned gender). 5. A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender). 6. A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender).

*Gibson v. Collier*, 920 F.3d 212, 217 (5th Cir. 2019) (citing *The American Psychiatric Association*, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (DSM-5)).

Despite now identifying as transgender, on her February 10, 2014 LSP Mental Health Intake Screening form Plaintiff self-reported as "bi-sexual," not "Gender Nonconforming." (Doc. 87-1 at p. 13). And though Plaintiff was diagnosed with multiple mental health conditions at the outset of her prison term—including Bipolar Disorder, Major Depressive Disorder, ADHD Combined Type, and Unspecified Personality Disorder—gender dysphoria was not among them. (*Id.* at p. 10).

In fact, for more than two years after her arrival at LSP—until June 8, 2016— there is no indication whatsoever in Plaintiff's extensive prison record that she identified as transgender, or, for that matter, reported experiencing symptoms of gender dysphoria. This is noteworthy because prior to June 2016, Plaintiff proved

3

quite capable of raising complaints regarding her treatment at LSP. As just one example, in February 2016 Plaintiff submitted a 15-page administrative grievance (ARP) challenging all manner of restrictions at LSP, and demanding all manner of relief—including "proper clothes," increased access to "items from the canteen," additional "toiletries," and modified procedures related to "haircuts" and "showers." (*See* Doc. 29-1 at pp. 63-65). Despite the overlap between the relief requested in this action, none of Plaintiff's claims or demands in her February 2016 ARP were tied to issues of gender-identity or symptoms of gender dysphoria. By contrast, six months later, in her August 2016 ARP seeking private showers and restrooms, Plaintiff expressly identified as "a transgender inmate." (Doc. 29-1 at p. 95).

In any event, since arriving at LSP Plaintiff has received uninterrupted mental health treatment from a team consisting of psychiatrists, psychologists, physicians, nurses, licensed social workers, and counselors. This team includes remaining Defendants Dr. Lavespere, Dr. Gamble, Dr. Park, and Nurse "L. Ducote," under the ultimate supervision of Defendant Warden Vannoy. Since February 2020, this team also includes non-party Dr. Warren Fraser, an "outside" endocrinologist contracted by the Louisiana Department of Public Safety and Corrections (DPSC), under whose supervision Plaintiff now receives hormone therapy.

Consistent with DPSC and LSP policies, Plaintiff's mental health team has always treated Plaintiff under a written Mental Health Plan of Care (MHPC). Since 2021, according to updated policies, Plaintiff's mental health team has treated Plaintiff under a written Transgender Intersex Facility Team (TIFT) Treatment Plan

(discussed below). Plaintiff's mental health treatment plan is updated annually to address Plaintiff's mental health concerns/needs, corresponding "goals," and therapeutic interventions/actions. (Doc. 87-1 at p. 16 (2014 MHPC); *see also* Doc. 29-5 at p. 290 (2015 MHPC), p. 254 (2016 MHPC), p. 223 (2017 MHPC), p. 171 (2018 MHPC); Doc. 29-4 at p. 216 (2019 MHPC); Doc. 86-5 (2020 MHPC); Doc. 86-5 at pp. 40-41 (2021 TIFT Treatment Plan)). Each year, Plaintiff indicates her approval of her continuing treatment plan by affixing her signature at the bottom. Plaintiff refused to sign her MHPC only once, in November 2018. (Doc. 29-5 at p. 172 (2018 MHPC)).

The first written record that Plaintiff suffers from gender dysphoria appears in a June 8, 2016 treatment note entered by Dr. Gamble, Plaintiff's attending psychiatrist. Dr. Gamble's note states that during her June 8 appointment, Plaintiff complained of "some stressors that are [unintelligible] in context of gender dysphoria issues and incarceration-related stressors." (Doc. 29-5 at p. 266). At this time, Plaintiff made two demands for interventions to treat gender dysphoria:

1. Pt wants to be placed hormones [sic] female. Pt states he took those hormones on the streets. He purchased them illegally on the streets.

2. Pt wants to shower by himself. He states its @ [sic] law.

(Doc. 29-4 at p. 148). On June 14, 2016, Dr. Lavespere noted in Plaintiff's chart "Hormones Denied[,] Shower as per security." (*Id.*).

Plaintiff missed her next appointment with Dr. Gamble, on September 7, 2016, because she was confined to administrative segregation after being caught engaged in consensual sex with another inmate in the shower. (Doc. 29-3 at pp. 28-33).

On October 18, 2016, at Plaintiff's make-up appointment, Dr. Gamble

diagnosed Plaintiff with GD (in addition to her prior diagnoses) and referred Plaintiff to Dr. Lavespere specifically to discuss hormone therapy treatment. (Doc. 29-5 at p. 259). During this October 18 appointment, Dr. Gamble even called Dr. Lavespere to emphasize the necessity of hormone therapy in Plaintiff's case, telling Dr. Lavespere that "he [Dr. Gamble] believed that [Plaintiff] was a prime candidate for hormone treatments." (Doc. 87 at p. 3). Curiously, also during this October 18 appointment, Dr. Gamble informed Plaintiff that he had not previously diagnosed her with gender dysphoria "due to moral religious [sic] reasons," which required him "to speak to his priest about [Plaintiff] and the moral decisions his job requires." (Doc. 87 at pp. 3-4).

Despite Dr. Gamble's referral and recommendation, Dr. Lavespere did treat Plaintiff following her October 18 appointment. Instead, Dr. Lavespere noted in Plaintiff's medical records: "Case under Discussion at HQ office[.] No appt @ this time. No need for clinic visit. This can go in chart." (Doc. 29-4 at p. 139). Six weeks later, when Plaintiff renewed her request for hormone therapy, Dr. Lavespere again wrote: "policy being discussed @ HQ office." (*Id.* at p. 131).

As indicated by Dr. Lavespere's notes, at the time of Plaintiff's diagnosis DPSC did not have a specific policy related to transgender inmates or gender dysphoria, but was in the process of developing one. A member of Plaintiff's care team explained this to Plaintiff on August 4, 2016, stating:

> SW [Social Worker] spoke to o/f [offender] this date concerning a letter he wrote to clinician. In the letter o/f requested information on receiving hormone therapy, transgender classes held at LSP, and being able to wear make-up and feminine clothing. SW advised o/f that she consulted with her supervisor and was advised that Louisiana Department of Corrections is in the process of formulating policies related to

6

transgender offenders but there are no specific policies related to his [sic] concerns or special groups held here at LSP for those with gender dysphoria. Also o/f will need to follow dress code policies for LSP since he is housed at LSP.

(Doc. 29-5 at p. 261).

Things changed, however, in October 2017, when DPSC issued Health Care Policy No. 47, titled "Identification And Management Of Intersex Offenders, Transgender Offenders, And Offenders Diagnosed With Gender Dysphoria." (Doc. 87-5 at pp. 32-43). Significantly, Policy 47 mandates that all DPSC facilities "shall have a comprehensive approach for identifying and managing intersex offenders, transgender offenders, and offenders diagnosed with gender dysphoria issues"; that inmates diagnosed with GD shall be assigned a treatment team consisting of (at minimum) the facilities' Prison Rape Elimination Act (PREA) Coordinator, Unit Head, Security Representative, Mental Health Director, Medical Director, and Nursing Director; that the treatment team shall develop and implement "an individualized [written] treatment plan, which shall meet the acceptable standard of care," to include consultation "with a specialist, such as an endocrinologist"; and that, "[i]f deemed medically necessary, hormone therapy shall be provided in accordance with relevant clinical guidelines." (Doc. 87-2 at p. 32-33, 38-39).

Additionally, Policy 47 requires that transgender inmates and inmates diagnosed with GD be provided: "housing and programming" placement on a "case-by-case basis," to include a determination regarding "whether to assign [the] offender … to a male or female facility," taking into account "the offender's health and safety" and "[w]hether that placement would present management or security problems";

7

"the opportunity to shower separately from other offenders"; gender-affirming undergarments upon request (*e.g.*, a "sports bra"). (*Id.* at pp. 38-40). "All other offender requests for items related to intersex, transgender, and gender dysphoria disorders needs shall be sent to the Unit Manager and then forwarded to the [treatment team and/or DPSC] for review." (*Id.* at p. 40). Policy 47 further requires that all prison personnel be trained regarding "[t]he definition of gender dysphoria"; "how to communicate effectively and professionally with offenders identifying as intersex or transgender"—including "appropriate use of the relative pronouns"; and "how to conduct cross-gender pat-down searches and searches of offenders identifying as intersex and transgender in a professional and respectful manner, and in the least intrusive manner possible, consistent with security needs." (*Id.* at pp. 40-42).

In March 2019, DPSC issued an updated Policy 47. (Doc. 86-6). This operative version maintains essentially the same provisions and interventions set forth above, with some slight modifications. For example, under updated Policy 47, a transgender inmate's treatment team is now called the "Transgender/Intersex Facility Team (TIFT)." (Doc. 86-6 at p. 3). Additionally, a sports bra is now available to a transgender male "if medically indicated." (*Id.* at p. 7). On April 22, 2019, Warden Vannoy implemented Directive No. 13.096, a carbon-copy of updated Policy 47, to govern LSP's procedures related to transgender inmates and inmates diagnosed with GD. (Doc. 38-3).

On November 16, 2017, five weeks after Policy 47's original enactment, and with Plaintiff's approval, Plaintiff's MHPC was updated to expressly identify

"DEPRESSION due to Gender Dysphoria" as Plaintiff's primary "concern." (*Compare* Doc. 29-5 at pp. 223-224 (2017 MPHC) *with id.* at pp. 254-255 (2016 MPHC)). At all times since, Plaintiff's MPHC has identified multiple goals related to gender dysphoria, collectively aimed to improve Plaintiff's mental and physical health, and has provided multiple interventions, including "medication management," "medication as directed by psychiatrist," and "individual and/or group sessions." (Doc. 29-5 at p. 223 (2017 MHPC); *see also id.* at p. 171 (2018 MHPC); Doc. 29-4 at p. 216 (2019 MHPC); Doc. 86-5 at p. 38 (2020 MHPC)).

Additionally, since March 2021, consistent with updated DPSC Policy 47 and LSP Directive 13.096, Plaintiff's GD has been treated under a "TIFT Treatment Plan." (Doc. 86-5 at pp. 51-52). Like her MHPC, Plaintiff's TIFT Treatment Plan sets forth multiple interventions aimed to reduce "symptoms of depression and anxiety," and "[i]ncrease comfort with the disparity between expressed and birth gender." These interventions include "Supportive Counseling," "education as needed on diagnosis and treatment course," "referral to medical/Endocrinology for hormone consideration," separate shower facilities, and a sports bra. (*Id.*).

From its inception in October 2017, Policy 47 promised hormone therapy to inmates diagnosed with GD, "if deemed medically necessary." (Doc. 87-2 at p. 39). For two years, however, this promise was unfulfilled at LSP. Dr. Lavespere now admits that this was due to DPSC's failure to employ a "qualified specialist" capable of prescribing hormone therapy and supervising its administration to inmates in LSP's custody and care. (Doc. 86-4 at ¶ 5). To address this need, DPSC engaged a search

"for an outside physician to evaluate transgender inmates across all facilities," and eventually landed on Dr. Warren Fraser, an endocrinologist. (*Id.* at ¶ 6). Dr. Fraser interviewed with DPSC in July 2019. (*Id.*). Dr. Fraser's contract with the DOC was approved and finalized on January 15, 2020. (Doc. 32).

Dr. Fraser treated Plaintiff for the first time on February 3, 2020. At this visit, Dr. Fraser confirmed Dr. Gamble's October 2016 diagnosis of GD, and developed a plan to start Plaintiff on hormone therapy. (Doc. 86-5 at pp. 30-31). Dr. Fraser further recommended that Plaintiff "be offered as much bodily privacy as possible," and that Plaintiff "be allowed to dress and groom as a phenotypic female," *to the extent* that these recommendations "do[] not jeopardize the security policies of the prison." (*Id.*). Dr. Fraser's notes of Plaintiff's February 3 appointment state:

> Subjective – This is a 41 year old biological male whom I was asked to ~~see~~ evaluate regarding male to female gender dysphoria. The patient is incarcerated at Angola and was seen via telemed. She indicated that as a child she preferred girl names and activities. At age 16 she began dressing as a female. In her 20's she became aware of the concept of gender dysphoria + felt that she was indeed a female in a male's body. At age 31 she experimented with hormones from off the street until she was incarcerated at Angola. The past two years she has worked with a therapist + psychiatrist. From a mental ~~help~~ health perspective the diagnosis of gender dysphoria is appropriate. Past medical history is unremarkable except for chronic back pain and depression.
>
> Objective – Physical exam not possible via telemed. Lab from 12/08/2019 shows normal results for CBC + chemistries. Her testosterone is 850 which is compatible with a biologic [sic] male. There is a minor elevation of [unintelligible] which may be drug related and is insignificant.
>
> Assesment [sic] – I concur with the diagnosis of gender dysphoria. The patient wishes hormone treatment which I believe is appropriate.
>
> Plan –        1. Estradiol 2 mg twice daily
>
>                2. Spironolactone 100 mg twice daily

> 3. Testosterone level in 3 months
>
> 4. Follow visit in 3 months [to evaluate] the results of the testosterone available
>
> 5. I recommend that Ms. Clark be allowed to dress and groom as a phenotypic female to the extent that it does not jeopardize the security policies of the prison
>
> 6. I also recommend that she be offered as much bodily privacy as possible without jeopardizing prison security.

(Doc. 86-5 at pp. 30-31).

It took three more months, but on May 20, 2020, Dr. Lavespere finally approved Plaintiff for hormone therapy, consisting of estrogen and spironolactone. (Doc. 86-5 at p. 34; *see also id.* at p. 42). Plaintiff admits that she continues to receive hormone therapy, and also has since been provided a sports bra. (Doc. 87 at p. 9). Dr. Fraser's treatment notes indicate Plaintiff has responded well to hormone therapy and "is pleased" with her progress. (Doc. 86-5 at p. 48). Plaintiff's testosterone is now "undetectable," she has developed breasts, and "[n]o longer gets erections," but "still has facial hair." (*Id.*).

Even before receiving hormone therapy, Plaintiff made repeated demands for additional non-medical interventions, including electrolysis, female cosmetics, and additional female commissary items. (Doc. 85-6 at p. 41; *see also* Doc. 87-2 at pp. 26, 121-122). Dr. Fraser has recommended "electrolysis if available" and "access to feminine products to the extent that it does not jeopardize security policies." (Doc. 85-6 at p. 42). To date, these requests have been denied. (*See id.*; *see also* Doc. 87 at p. 9 ("All other treatments recommended by the endocrinologist … have been denied except a bra.")).

11

Against this backdrop, Plaintiff has endured multiple mental health crises throughout her imprisonment at LSP. These crises pre-date her GD diagnosis, to December 2015, when Plaintiff first attempted suicide by tying a sheet around her neck. (Doc. 29-5 at p. 287). Plaintiff attributed this initial suicide attempt to bullying and harassment she experienced due to being gay. (*Id.*). Plaintiff's episodic mental health crises have persisted even after being diagnosed with GD. Plaintiff frequently reports feeling suicidal, invariably resulting in her removal from the general prison population to segregated suicide watch, and has mutilated herself at least twice. In October 2018, Plaintiff attempted auto-castration, explaining that she "was tired of being trapped in a man's body," and that if she cut her "testicles off it would decrease the amount of testosterone in his [sic] body and which [sic] would result in more feminine features." (Doc. 29-5 at p. 189). In May 2019, Plaintiff cut herself again, explaining that she was "feeling depressed and suicidal because he [sic] has not received hormone medications that are prescribed to him [sic]." (Doc. 29-4 at pp. 330, 340).

Finally, Plaintiff has committed multiple disciplinary infractions at LSP, which have also resulted in her removal to administrative segregation. Included among these is an August 2018 altercation that resulted in the death of another inmate. (Doc. 29-5 at pp. 199-200, 204; *see also* Doc. 29-1 at p. 133). Also included is the sexual encounter of August 2016 that resulted in Plaintiff missing her September 2016 appointment with Dr. Gamble (referenced above). Plaintiff's August 2016 infraction forms the basis of her claims against remaining Defendants Correctional

12

Officer (CO) Lacomb and CO Rheams. In her August 22, 2016 ARP, Plaintiff described this episode as follows:

> On August 15, 2016, I had consensual sex with an inmate in Eagle 1 shower and was viewed by (3) officers (Lt. Col. Rheams, Cpt. LaCombe [sic], and Lt. Jones) and (1) one inmate on camera. Since, I have been harassed, and verbally assaulted pertaining to the videos.

(Doc. 29-1 at p. 95). On September 15, 2016, Plaintiff withdrew this ARP, certifying "I no longer wish to pursue this matter through the Administrative Remedy Process," and "I voluntarily make this request of my own free will, without coercion and without promise of reward." (*Id.* at p. 97).

### B. Relevant Procedural History

Plaintiff initiated this action on August 7, 2019, 22 months after DPSC issued Policy 47, four months after LSP issued Directive No. 13.096, and one month after DPSC conducted its initial interview of Dr. Fraser. At the time, Plaintiff was still six months from her first appointment with Dr. Fraser, and nine months from receiving hormone therapy under Dr. Fraser's supervision. (Doc. 1).

Plaintiff's operative Amended Complaint alleges *only* constitutional claims of cruel and unusual punishment in violation of the Eighth Amendment, and challenges two aspects of her confinement: first, whether she has been provided adequate medical treatment for gender dysphoria; and, second, whether surveillance video of her August 2016 sexual encounter in the shower is being used for "non-security reasons" and to embarrass her. (Doc. 7 at pp. 23-25). Plaintiff seeks compensatory and punitive damages, attorney's fees, and wide-ranging injunctive relief. Specifically, Plaintiff demands (1) policies that allow inmates "with gender dysphoria

13

[to receive] individualized medically appropriate treatment"; (2) "to be examined by a qualified specialist with experience in treating gender dysphoria"; (3) "hormone therapy"; (4) "to be allowed to express her female gender through grooming, clothing, and female pronoun use"; (5) "electrolysis on her face, chest, and legs and to be allowed use of razor or shaving powder until its complete"; (6) "effeminate commissary products sold to females in DOC … such as but not limited to ponytail ties, pony tail holders, hair caps, pink lotion, sanitary pads, lip stick, eyeliner, etc."; and (7) that security cameras "be removed from the shower and bathroom areas." (*Id.* at pp. 26-28).[4] "Plaintiff does not currently seek sex reassignment surgery." (Doc. 87 at p. 7).

Plaintiff's Amended Complaint names 21 Defendants, each in their official *and* individual capacities. (Doc. 7 at pp. 1-3). Among these, 13 Defendants have already been dismissed, either because Plaintiff failed to allege their personal involvement in the events at issue, or because Plaintiff failed to effect timely service. (*See* Doc. 49, Doc. 54, Doc. 58). Eight Defendants remain: (1) LSP Warden Darrel Vannoy[5]; (2)

---

[4] Additionally, Plaintiff demands that Defendants be ordered "to not force plaintiff to expose her breast and/or genital areas to other inmates absent exigent circumstances"; "to establish[] policy and training … on how to investigate and pursue PREA allegations in a confidential manner"; and "to stop retaliation efforts and attempts to hinder legal redress." (Doc. 7 at p. 26). It is not clear from Plaintiff's Amended Complaint how these demands relate to her underlying claims. In any event, Plaintiff's summary judgment papers do not address these demands in *any* manner whatsoever. As such, the Court determines that these demands are abandoned, and waived at this stage of the proceedings. *See Buchicchio v. LeBlanc*, 22-cv-00147, 2023 WL 2027809, at *10 (M.D. La. Feb. 15, 2023) (explaining that the Court "will not speculate on arguments that have not been advanced, or attempt to develop arguments on a party's behalf," and that under the Local Civil Rules issues not briefed are waived).

[5] Strictly speaking, Plaintiff's official capacity claims against Warden Vannoy passed to current LSP Warden Tim Hooper in June 2021, upon Vannoy's retirement and Hooper's appointment as Vannoy's successor. *See Kentucky v. Graham*, 473 U.S. 159, 166 n.11 (1985)

DPSC Medical Director Dr. Randy Lavespere; (3) LSP psychiatrist Dr. Mathew Gamble; (4) LSP Physician Cynthia Park; (5) LSP Nurse "L. Ducote"; (6) LSP CO Bradley Lacomb; (7) LSP CO Luke Rheams; and (8) LSP Chief of Operations (COO) Seth Smith.

Now before the Court is a **Motion For Summary Judgment (Doc. 86, the "Motion")**, seeking dismissal of Plaintiffs' claims against Warden Vannoy, Dr. Lavespere, Dr. Gamble, CO Lacomb, and CO Rheams. (Doc. 87). For the reasons stated herein, the Moving Defendants' Motion will be granted. Additionally, Plaintiff's claims against COO Smith, Dr. Park, and Nurse "L. Ducote"—which are *not* addressed by the Moving Defendants (despite being represented by the same counsel)—will be dismissed as frivolous under 28 U.S.C. §§ 1915(e) and 1915A. In sum, as a result of this Order, all claims against all Defendants will be dismissed.

## II. ANALYSIS

### A. Standard

The summary judgment standard is well-set: to prevail, Defendants must show that there is no genuine dispute as to any material fact and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In making this assessment, the Court must view all evidence and make all reasonable inferences in the light most favorable to Plaintiff—the non-moving party. *Owens v. Circassia Pharms., Inc.*, 33

---

("In an official-capacity action in federal court, death or replacement of the named official will result in automatic substitution of the official's successor in office." (citing Fed. Rule Civ. Proc. 25(d)(1)). Rather than introduce yet another named Defendant at this late date, however, the Court will maintain Vannoy as the placeholder for Plaintiff's official capacity claims against the LSP Warden. Of course, Vannoy's retirement does not impact the analysis of Plaintiff's individual capacity claims against him.

F.4th 814, 824 (5th Cir. 2022). Even so, Plaintiff must counter with *concrete* evidence to support her claims: "A non-movant will not avoid summary judgment by presenting speculation, improbable inferences, or unsubstantiated assertions." *Jones v. United States*, 936 F.3d 318, 321 (5th Cir. 2019) (quotation marks omitted); *see also* M.D. La. LR 56. To the point, summary judgment is *required* if Plaintiff fails to produce any summary judgment evidence on an essential element of her claim(s). *Geiserman v. MacDonald*, 893 F.2d 787, 793 (5th Cir. 1990).

### B. Discussion

The Eighth Amendment forbids cruel and unusual punishments. This prohibition includes "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Defendants concede that gender dysphoria is a serious medical need.

The Court's analysis, then, is driven entirely by whether Defendants' response to Plaintiff's GD amounts to deliberate indifference. The Fifth Circuit cautions that "deliberate indifference" is "a demanding standard." *Gibson*, 920 F.3d at 219.

> Negligence or inadvertence is not enough. A complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. An inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind.
>
> Rather, the inmate must show that officials acted with malicious intent—that is, with knowledge that they were withholding medically necessary care. The plaintiff must show that officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.
>
> There is no intentional or wanton deprivation of care if a genuine debate

16

exists within the medical community about the necessity or efficacy of that care. Disagreement with medical treatment does not state a claim for Eighth Amendment indifference to medical needs. There is no Eighth Amendment claim just because an inmate believes that medical personnel should have attempted different diagnostic measures or alternative methods of treatment.

*Id.* at 219–20.

### i. Injunctive and declaratory relief (official capacity claims)

Plaintiff's official capacity claims for declaratory and injunctive relief suffer multiple flaws. First, Plaintiff pursues these claims against *all* Defendants. This is redundant. Official capacity suits are "really suits against the governmental entity"— here, LSP, the entity responsible for Plaintiff's confinement. *Goodman v. Harris Cnty.*, 571 F.3d 388, 396 (5th Cir. 2009). Warden Vannoy is the appropriate Defendant to respond to these claims. *See id.* Plaintiff's official capacity claims against the remaining Defendants will be dismissed.

Second, two of Plaintiff's original demands are now moot, specifically, Plaintiff's requests "to be examined by a qualified specialist with experience in treating gender dysphoria," and for "hormone therapy." It is undisputed that Dr. Fraser has treated Plaintiff continuously since February 2020, and that Plaintiff has received hormone therapy since May 2020. Further, there is no indication on this record that the State has ginned up a mootness defense by agreeing to provide hormone therapy to Plaintiff (through Dr. Fraser) in order to avoid an adverse judgment. To the contrary, the evidence is undisputed that even prior to pursuing this action, Plaintiff was diagnosed with gender dysphoria, LSP adopted policies to provide hormone therapy to inmates diagnosed GD, *and* that LSP was in the process

17

of contracting with Dr. Fraser to provide transgender inmates with hormone therapy upon a showing of medical necessity. Here, there is simply no "reasonable basis" to believe that, following a dismissal, LSP will revert to refusing hormone therapy to Plaintiff. *See Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1271 (11th Cir. 2020) (transgender inmate's "hormone-therapy-related challenge [was] moot" where two weeks after the plaintiff filed suit the Florida Department of Corrections "referred her to an endocrinologist who prescribed her hormone therapy").

Essentially the same goes for Plaintiff's demand for implementation of policies that allow inmates "with gender dysphoria [to receive] individualized medically appropriate treatment." Indeed, it appears this demand was moot even *before* Plaintiff filed suit in August 2019, insofar as LSP's Directive No. 13.096 was four months old at that time. Consistent with DPSC Policy 47, LSP Directive No. 13.096 expressly provides that "[t]he TIFT shall formulate an individualized treatment plan for those diagnosed with [gender dysphoria], which shall meet the acceptable standard of care," *and* that the TIFT Treatment Plan shall be "a written assessment of individualized, needs based, required services and interventions including a statement of the short-term goals, long-term measurable outcomes, and the roles of healthcare and non-healthcare personnel for the purpose of providing necessary treatment and services in accordance with a patient's identified needs and problem areas." (Doc. 38-3 at pp. 2-3). It is undisputed that Plaintiff's first TIFT Treatment Plan was issued in March 2021, and that, under this Plan, Plaintiff receives hormone therapy, counseling, housing and programming accommodations, separate shower

facilities, and a sports bra. And again, there is no "reasonable basis" to believe that, following a dismissal, LSP will scuttle Directive No. 13.096 *or* Plaintiff's individualized interventions.[6] *See Keohane*, 952 F.3d at 1267 (transgender inmate's challenge to prison's "freeze-frame policy"—whereby the medical care of inmates diagnosed with GD was restricted to "the treatment they were (or weren't) receiving at the time of their [original] incarceration"—was moot where Florida Department of Corrections rescinded the policy two months after Plaintiff sued and replaced it with a new policy "that properly attends to inmates' individualized medical needs").

Next, even if not moot, Plaintiff's demand that cameras "be removed from the shower and bathroom areas" is a nonstarter on the merits, implicating obvious disciplinary and security concerns, as illustrated by Plaintiff's *own* prison record. *See Oliver v. Scott*, 276 F.3d 736, 746 (5th Cir. 2002) (permitting constant cross-sex video surveillance of prison bathrooms and showers because these areas "could serve as harbors for inmate-on-inmate violence and sexual assaults"). Warden Vannoy has determined that security cameras are an appropriate means to promote security and discipline at LSP, and the Court will not substitute its judgment for the Warden's in this regard. *See Bell v. Wolfish*, 441 U.S. 520, 547 (1979) ("[T]he problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference

---

[6] Notably, Plaintiff all but concedes that the interventions she now receives to address her gender dysphoria are constitutionally adequate, stating in her opposition papers: "Even if a factfinder could conclude the plaintiff is now receiving medical care that is adequate that same jury could conclude that it did not began [sic] until after the suit was filed[.]" (Doc. 87 at p. 11).

in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."); *accord Garrett v. Thaler*, 560 F. App'x 375, 380 (5th Cir. 2014) ("constant surveillance, even cross-sex surveillance, of prisoners is constitutional because it is reasonably related to the penological interest of maintaining security." (collecting cases)).

What's left are Plaintiff's demands for electrolysis, cosmetics, and other female commissary items, and related accommodations—specifically, to grow out her hair, use makeup, and wear female undergarments—so that she may "express her female gender." These demands unquestionably present a live controversy, insofar as LSP continues to refuse these requests. Further, unlike Plaintiff's surveillance-related claims, these demands have not already been shot down by the Fifth Circuit. Accordingly, a closer merits review is required.

Stripped of the noise, Plaintiff contends that in addition to hormone therapy, counseling, and other individualized interventions to treat GD, the Eighth Amendment compels the State to aid her social transition by providing additional non-medical items—more than just a sports bra—to affirm her gender identity. The Fifth Circuit has not squarely addressed this claim, but the Eleventh Circuit has, holding in a nearly identical case that the State does not violate the Eighth Amendment when it denies an inmate's "social transitioning requests" because "unlike with respect to hormone therapy," which now enjoys widespread consensus as an effective and often necessary treatment for GD, medical professionals remain

20

"divided over whether social transitioning is medically necessary to … gender-dysphoria treatment." *Keohane*, 952 F.3d at 1274. "Put simply, when the medical community can't agree on the appropriate course of care, there is … no legal basis for concluding that the treatment provided is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Id.* at 1275. The Eleventh Circuit bolsters this conclusion, noting that "[w]hen evaluating medical care and deliberate indifference, security considerations inherent in the functioning of a penological institution must be given significant weight," and that the State denied the plaintiff's "social-transitioning-related requests, at least in part, on the ground that they presented serious security concerns—including, most obviously, that an inmate dressed and groomed as a female would inevitably become a target for abuse in an all-male prison." *Id.*

The only meaningful distinction between this case and *Keohane* is that the *Keohane* Court benefited from a better developed summary judgment record, in that the evidence included actual trial testimony setting forth medical professionals' conflicting opinions regarding the efficacy and medical necessity of social transitioning to treatment of GD. In this record, actual evidence of conflicting opinion is slim. No matter. The Fifth Circuit instructs that the Court may take notice of the divergent medical opinions set forth in *Keohane*. *See Gibson*, 920 F.3d at 222–23 (taking notice of expert testimony and medical evidence developed in *Kosilek v. Spencer*, 774 F.3d 63, 68 (1st Cir. 2014) to determine that divergent opinions exist as to the medical necessity of gender reassignment surgery for the treatment of GD).

In sum, the law is clear that "[t]here is no intentional or wanton deprivation of care if a genuine debate exists within the medical community about the necessity or efficacy of that care." *Gibson*, 920 F.3d at 220. And the evidence is clear that, at least now, a genuine debate exists as to the medical necessity of social transitioning to GD treatment. *Keohane*, 952 F.3d at 1275. Thus, Plaintiff's deliberate indifference claim fails. This conclusion carries even more force when, as here, Plaintiff "has not been refused care entirely, but has instead been given a meaningful course of treatment that includes many (if not all) of the components that she originally sought," and the additional relief she seeks—to dress and groom as a female in a male prison— presents obvious safety and security concerns. *Id.* at 1275-76.

Plaintiff's official capacity claims must be dismissed.

### ii.  Damages (individual capacity claims)

Plaintiff's remaining claims for damages are equally doomed, for different reasons. Specifically, Plaintiff's  medical indifference claims against Warden Vannoy, Dr. Lavespere, and Dr. Gamble are defeated by qualified immunity; Plaintiff's surveillance video claims against CO Lacomb and CO Rheams are not exhausted.

### a.  Qualified Immunity (Warden Vannoy, Dr. Lavespere, and Dr. Gamble)

Qualified immunity shields a government official from individual liability for civil damages when the "official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *City of Escondido, Calif. v. Emmons*, 139 S. Ct. 500, 503 (2019). Its purpose is to strike a balance "between the interests in vindication of citizens' constitutional rights and

22

in public officials' effective performance of their duties, by making it possible for government officials to reasonably anticipate when their conduct may give rise to liability for damages." *See Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (quotation marks and alterations omitted).

The Fifth Circuit's two-pronged test for qualified immunity asks (1) "whether the facts, viewed in the light most favorable to the party asserting the injury, show that the official's conduct violated a constitutional right," and (2) "whether the right was 'clearly established.'" *Cunningham v. Castloo*, 983 F.3d 185, 190-91 (5th Cir. 2020). A court may analyze these prongs in either order, and resolve the case on a single prong. *Id.* at 190.

Here, the Court does not reach the "clearly established" prong because it is undisputed that, at all times, Defendants responded to and treated Plaintiff's gender dysphoria—albeit not to Plaintiff's preferred standard of care. Thus, Defendants did *not* act with deliberate indifference to Plaintiff's serious medical need, and Plaintiff cannot show that her Eighth Amendment right to be free from cruel and unusual punishment was violated.

### 1. Warden Vannoy

Having combed the record, there is no evidence of Warden Vannoy's personal involvement in the events giving rise to Plaintiff's action. But a supervisory official who is not directly involved in a constitutional violation may nonetheless be liable for his failure to adopt policies *or* his failure to adequately train or supervise his employees, if such failures causally result in a constitutional injury. *Buchicchio v. LeBlanc*, --- F.Supp.3d ----, 2023 WL 2027809, at *13-14 (M.D. La. Feb. 15, 2023).

"An unconstitutional failure to train is not the same as an unconstitutional failure to adopt policies; each is a distinct theory of *Monell* liability." *Id.* at *14 (citing authorities). Still, to prevail under either theory, Plaintiff must plausibly establish that Warden Vannoy "acted, or failed to act, with 'deliberate indifference,' that is, 'a disregard for a known or obvious consequence of his actions.'" *See id.* (quoting *Crittindon v. LeBlanc*, 37 F.4th 177, 186 (5th Cir. 2022)). This typically requires showing a pattern of similar constitutional violations due to deficient policies, permitting the inference that Defendants deliberately chose policies causing violations of constitutional rights. *Crittindon*, 37 F.4th at 186.

Liberally construed, Plaintiff *alleges* that Warden Vannoy violated the Eighth Amendment's prohibition against cruel and unusual punishment by failing to implement policies "to treat, interact, and respond to transexuals and offenders with gender dysphoria"; failing to train LSP personnel regarding the same; failing to properly supervise Dr. Lavespere, Dr. Gamble, and the other members of Plaintiff's medical team; *and* maintaining "cameras in the toilet and shower areas," thereby exposing Plaintiff to "voyeurism." (Doc. 7 at pp. 23-24). Each of these claims fails at summary judgment, however, because the *evidence* does not provide any basis to conclude that these alleged failures amounted to deliberate indifference.

First, it is undisputed that even before Plaintiff filed suit, Warden Vannoy implemented Directive No. 13.096, which, *on its face*, requires individualized medical treatment and accommodations for offenders diagnosed with GD, *and* training regarding how to respond to and interact with such offenders. Directive No. 13.096 is

24

the exact *opposite* of deliberate indifference, establishing that Warden Vannoy was aware of a problem, and responded directly to address it.

Second, Plaintiff has identified no evidence that Warden Vannoy failed to train LSP personnel regarding Directive No. 13.096, or even any evidence establishing a pattern of inappropriate interactions between LSP staff and transgender inmates. Allegations aside, Plaintiff's failure to produce *evidence* on this essential element is fatal to her claim. *Geiserman*, 893 F.2d at 793.

Likewise, Plaintiff points to no evidence supporting a determination that Warden Vannoy failed to properly supervise her medical team. And again, the evidence suggests the opposite. As discussed more fully below, at all times Plaintiff remained under the regular and responsive care of a medical team that provided treatments and interventions corresponding to Plaintiff's professed complaints, albeit not to the standard Plaintiff desired.

Finally, again, the Court will not second guess Warden Vannoy's policy of maintaining security cameras in prison toilet and shower areas, given the obvious countervailing disciplinary and security considerations, particularly here where the basis of Plaintiff's claim is her undisputed involvement in an illicit consensual sexual encounter that occurred in plain view. *See Keohane*, 952 F.3d at 1275 ("When evaluating medical care and deliberate indifference, security considerations inherent in the functioning of a penological institution must be given significant weight." (quoting *Kosilek*, 774 F.3d at 83)); *cf. Oliver*, 276 F.3d at 746 (permitting constant cross-sex video surveillance of prison bathrooms and showers). Plaintiff's claims

against Warden Vannoy must be dismissed.

### 2. Dr. Lavespere and Dr. Gamble

Viewed in the light most favorable to Plaintiff, and giving Plaintiff the benefit of all reasonable inferences, the sum of the summary judgment evidence is this: From an early age, Plaintiff suffered an incongruence between her experienced/expressed gender (female) and assigned gender (male). In her twenties, Plaintiff learned of the "concept" of gender dysphoria, self-identified as "a female in a male's body," and thereafter "experimented with hormones from off the street" until her conviction and incarceration at LSP. (Doc. 86-5 at pp. 30-31). Yet, inexplicably, when she arrived at LSP in February 2014, Plaintiff did identify as transgender, or report that she suffered symptoms of GD. (Doc. 87-1 at pp. 12-13).

Since her arrival at LSP, due to her pre-existing diagnoses of Bipolar Disorder, Major Depressive Disorder, ADHD Combined Type, and Unspecified Personality Disorder (later Borderline Personality Disorder), Plaintiff has been under the regular and constant care of a medical team consisting of physicians, nurses, psychiatrists, psychologists, social workers, and counselors, including Dr. Lavespere and Dr. Gamble. Yet, despite weekly—sometimes daily—interactions with this team, for two years Plaintiff did not report suffering symptoms of GD.

Finally, on June 8, 2016, after having requested an appointment "to see Dr. Gamble due to insomnia," Plaintiff reported that she was experiencing "stressors" consistent with gender dysphoria. (Doc. 29-5 at pp. 266-267). Dr. Gamble did not immediately diagnose Plaintiff with GD at this June 8 visit—due to "moral" concerns that he wanted to discuss with his priest—but did adjust Plaintiff's medication

26

regimen in response to Plaintiff's complaints. (*Id.* at p. 266).

On October 18, 2016, at Plaintiff's next appointment, Dr. Gamble diagnosed Plaintiff with gender dysphoria (in addition to her prior diagnoses) and referred her to Dr. Lavespere to discuss hormone therapy treatment. (Doc. 29-5 at p. 259). During this appointment, Dr. Gamble even called Dr. Lavespere and emphasized that hormone therapy was important to Plaintiff's treatment. (Doc. 87 at p. 3). Perhaps Dr. Gamble would have diagnosed Plaintiff sooner—at her previously scheduled September 7 appointment—but Plaintiff missed this appointment after being caught having sex in the shower. (Doc. 29-3 at pp. 28-33).

It took until May 20, 2020—three-and-a-half years after Dr. Gamble's diagnosis and recommendation—but eventually Dr. Lavespere approved hormone therapy treatment for Plaintiff, to be administered under the supervision of Dr. Fraser, the newly contracted endocrinologist. Plaintiff continues to receive hormone therapy, and has responded positively to this treatment.

In the 43 months between October 18, 2016 and May 20, 2020, Plaintiff repeatedly demanded hormone therapy, complained of feeling trapped in a man's body," (Doc. 29-5 at p. 189), reported "feeling depressed and suicidal because he [sic] has not received hormone medications that are prescribed to him [sic]" (Doc. 29-4 at p. 330), and attempted suicide and auto-castration. An obvious possibility exists that had Plaintiff been provided hormone therapy at an earlier date, some of the mental health crises she has endured may have been averted. Still, during this time—and at *all* times before—Plaintiff *was* being treated for her mental health needs—including

gender dysphoria—through a combination of medication and counseling. (*See* Doc. 87-1 at p. 16 (2014 MHPC); *see also* Doc. 29-5 at p. 290 (2015 MHPC), p. 254 (2016 MHPC), p. 223 (2017 MHPC), p. 171 (2018 MHPC); Doc. 29-4 at p. 216 (2019 MHPC); Doc. 86-5 (2020 MHPC); Doc. 86-5 at pp. 40-41 (2021 TIFT Treatment Plan)).

The undisputed fact of Plaintiff's ongoing and continuous mental health treatment is fatal to her claims. Plaintiff strongly disagrees with the course of her treatment for GD. A better option—hormone therapy—was available immediately upon her diagnosis. Arguably, Dr. Gamble may have been negligent by failing to diagnose Plaintiff with GD at the June 8 appointment, given his statement that he needed to confer with his priest first. Almost certainly Dr. Lavespere was negligent for delaying Plaintiff's hormone therapy for 43 months, given that Plaintiff continued to suffer regular mental health crises during this time, despite being treated with medication and counseling. But none of these factors states a viable claim under controlling Eighth Amendment precedent, which instead requires a showing that Dr. Lavespere and Dr. Gamble refused treatment, ignored Plaintiff's complaints, intentionally treated Plaintiff incorrectly, "or engaged in any similar conduct that would clearly evince a wanton disregard" for Plaintiff's serious medical need. *Gibson*, 920 F.3d at 220 (quotation marks omitted). In short, while the evidence is deeply troubling, it does not rise to the level of deliberate indifference under the Eighth Amendment. *See id.* ("Disagreement with medical treatment does not state a claim for Eighth Amendment indifference to medical needs. There is no Eighth Amendment claim just because an inmate believes that medical personnel should have attempted

different diagnostic measures or alternative methods of treatment." (quotation marks and citations omitted)). Plaintiff's claims against Dr. Lavespere and Dr. Gamble must be dismissed.

### b. Exhaustion (CO Lacomb and CO Rheams)

In contrast to Plaintiff's medical necessity claims, Plaintiff's claims against CO Lacomb and CO Rheams are difficult to discern. Plaintiff alleges that these Defendants violated her "right to be free from cruel and unusual punishment" by recording, viewing, and allowing others "to see video footage of plaintiff naked, showering, using the toilet, and having sex for non-security reasons but instead for lewd sexual gratification." (Doc. 7 at pp. 23-24). The only summary judgment evidence in support of these claims, however, is Plaintiff's August 22, 2016 ARP, in which she complains that after being caught on camera engaged in "consensual sex with an inmate in Eagle 1 shower," she endured harassment and "verbal assault[] pertaining to the videos." (Doc. 29-1 at p. 95).

The Court is skeptical that the Eighth Amendment—or any constitutional provision, for that matter—protects Plaintiff from verbal harassment regarding an admittedly consensual sexual encounter captured on prison surveillance cameras. First, as indicated above, inmates enjoy, *at best*, only a minimal expectation of privacy from prison officials, which is *not* violated even by constant video surveillance in restrooms, showers, and dressing quarters. *See Garrett*, 560 F. App'x at 381 (collecting cases)). Second, the law is settled that "claims of verbal abuse are not actionable under § 1983." *Calhoun v. Hargrove*, 312 F.3d 730, 734 (5th Cir. 2002).

In any event, however, the Court need not weigh merits of these claims because

29

the undisputed evidence also establishes that they were not properly exhausted through LSP administrative channels. Instead, Plaintiff short-circuited the administrative review process by voluntarily withdrawing her August 22 ARP three weeks after she submitted it. *See Lizotte v. Leblanc*, 456 F. App'x 511, 513 (5th Cir. 2012) (a withdrawn ARP cannot satisfy the PLRA's exhaustion requirement where withdrawal did not result from an impediment created by prison officials).

## III.    REMAINING DEFENDANTS

Three Defendants remain: COO Smith; Dr. Park; and Nurse "L. Ducote." Inexplicably, the State does not address these Defendants in its summary judgment papers. And while the Court's summary judgment dismissal would almost certainly extend to these Defendants if only the State's attorneys had remembered to include them in the State's motion, the Court *cannot* grant summary judgment on grounds not raised without first giving Plaintiff notice and a reasonable opportunity to respond. Fed. R. Civ. P. 56(f)(2).

Here, however, there is no need to extend these proceedings further, because another avenue exists for dismissal of these Defendants. Plaintiff is proceeding *in forma pauperis* (IFP). (Doc. 9). Thus, the Court may dismiss Plaintiff's claims without notice if satisfied that they are frivolous, malicious, or otherwise not actionable. 28 U.S.C. §§ 1915(e), 1915A. A claim is frivolous "where it lacks an arguable basis either in law or in fact." *Denton v. Hernandez*, 504 U.S. 25, 31 (1992). As to the former, the Court may dismiss any claim based on "an indisputably meritless legal theory." *Id.* at 32. As to the latter, the Court enjoys "the unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual contentions

are clearly baseless." *Id.* "A district court may dismiss an IFP proceeding for frivolousness … at any time, before or after service of process and before or after the defendant's answer." *Green v. McKaskle*, 788 F.2d 1116, 1119 (5th Cir. 1986).

First, COO Smith. To this day, COO Smith has not been served, due to having been omitted from Plaintiff's list of Defendants requiring service by the U.S. Marshals Service. (*See* Doc. 25 at p. 1). As a result, COO Smith has never appeared in this action. Plaintiff's only claim against COO Smith is for having enacted DPSC "Offender Posted Policy #011," which allegedly "discriminates against transgenders and their right to express their gender preference." (Doc. 7 at p. 25). Plaintiff now clarifies that she specifically challenges the portion of Policy #011 that prohibits "Altering facial features or hair to project an opposite sex image and using products to project an opposite sex image." (Doc. 87 at p. 4; *see* Doc. 87-2 at p. 116). Essentially, this claim is a restatement of Plaintiff's demand to dress and groom as a female, which, as explained, lacks any legal basis due to the divergence of opinion regarding the medical necessity and efficacy of social transitioning to GD treatment, *and* the obvious safety and disciplinary concerns raised by permitting Plaintiff to dress and groom as a female in a male prison. *See Keohane*, 952 F.3d at 1275-76.

Second, Nurse "L. Ducote." In her Amended Complaint, Plaintiff includes "L. Ducote" among the Defendants charged with failing to provide "adequate medical treatment for her gender dysphoria." (Doc. 7 at p. 23). Other than this reference, Nurse "L. Ducote" appears *just once* in Plaintiff's entire Amended Complaint: specifically, among the "Parties" to the suit. (*Id.* at p. 8). In other words, in the space

between Plaintiff's list of "Parties" and Plaintiff's summary of "Claims"—*i.e.*, the operative factual basis of Plaintiff's action—"L. Ducote" is not mentioned at all. Further, it now appears that Plaintiff has failed to confirm even "L. Ducote's" identity, insofar as Plaintiff has *not* sought to amend her pleadings to provide a proper first name (as Plaintiff did most recently for Defendant CO Rheams). (*See* Doc. 83, Doc. 90). Plainly, *any* legal claim Plaintiff may wish to pursue against the still unknown "L. Ducote" is baseless, in the absence of any allegations to support it.

Finally, Dr. Park. Dr. Park is also among the Defendants charged with failing to provide adequate medical treatment for Plaintiff's GD. (Doc. 7 at p. 23). Plaintiff pursues Dr. Park based on two encounters, occurring on November 28 and 30, 2016. Plaintiff contends that on these dates, she sought treatment from Dr. Park for "lower back pain." Plaintiff further alleges that at the November 28 visit, she informed Dr. Park of her gender dysphoria diagnosis, and "reiterated" her requests "for hormone therapy, access to a razor, [and] electrolysis, allowing plaintiff to live as a female and express herself as a female via grooming," and more—essentially all of the demands underlying this case. Plaintiff contends that Dr. Park's response was hostile, evincing a clear bias "towards homosexuality," and that Dr. Park punished Plaintiff for making her requests by stripping her "of all work restrictions even before a back x-ray was completed." (Doc. 7 at pp. 18-20). Plaintiff further alleges that, at the November 30 visit, Dr. Park reversed course and ordered an x-ray, but that this was just "an attempt to cover up and justify [Dr. Park's prior] actions." (*Id.* at p. 20).

Here, the Court invokes its "unusual power" under §§ 1915(e) and 1915A "to

pierce the veil of the complaint's factual allegations," by reviewing the actual certified written record of Plaintiff's November 28 appointment with Dr. Park. *See Denton*, 504 U.S. at 31. Again, the authenticity of this treatment note is *not* challenged. *Supra* n. 3. Significantly, Dr. Park's November 28 treatment note reflects no bias whatsoever. (Doc. 29-4 at p. 131). To the contrary, and damning to Plaintiff's allegations, Dr. Park transparently transcribed *all* of Plaintiff's complaints and demands regarding her gender dysphoria diagnosis, and *also* ordered an x-ray of Plaintiff's back. (*Id.*). Additionally, Dr. Park forwarded Plaintiff's GD-related demands immediately to Dr. Lavespere for review, as indicated by Dr. Lavespere's handwritten response of November 29, 2016, stating (on the same treatment note), "policy being discussed @ HQ office." (*Id.*). True, it appears that Dr. Park "stripped Plaintiff of all work restrictions" as alleged, (Doc. 7 at p. 20), but this decision was based on Dr. Park's assessment that "no medical reason" justified any work restrictions. (Doc. 29-4 at p. 131). In this light, Plaintiff's allegations "are clearly baseless." *See Denton*, 504 U.S. at 31. Moreover, properly viewed, they establish merely a highly partisan disagreement with the course of care prescribed by Dr. Park, which, again, cannot sustain "a claim for Eighth Amendment indifference to medical needs." *Gibson*, 920 F.3d at 220.

In sum, Plaintiffs claims against COO Smith, Dr. Clark, and Nurse "L. Ducote" are frivolous, and will be dismissed pursuant to 28 U.S.C. §§ 1915(e) and 1915A.

## IV. CONCLUSION

Accordingly,

**IT IS ORDERED** that the **Motion For Summary Judgment (Doc. 86)**

submitted by Defendants Warden Vannoy, Dr. Lavespere, Dr. Gamble, CO Lacomb, and CO Rheams be and is hereby is **GRANTED**, and that Plaintiff's claims against these Defendants be and are hereby **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Plaintiff's claims against Defendants COO Smith, Dr. Clark, and Nurse "L. Ducote" be and are hereby **DISMISSED WITH PREJUDICE AS FRIVOLOUS** pursuant to 28 U.S.C. §§ 1915(e) and 1915A.

Having now dismissed all claims and Defendants, the Court shall issue final judgment dismissing this action.

Baton Rouge, Louisiana, this 27th day of March, 2023

**JUDGE BRIAN A. JACKSON**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**